# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DARYL CARPENTER, ET AL.,** | **CIVIL ACTION** |
|     **Plaintiffs** | |
| **VERSUS** | **NO. 17-808** |
| **WEBRE, ET AL.,** | **SECTION: "E"** |
|     **Defendants** | |

## ORDER AND REASONS

Before the Court are two motions: (1) a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants Sergeant Jeffery Prevost and Lafourche Parish Sheriff Craig Webre (collectively the "Sheriff Defendants"),[1] and (2) a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Castex Lafourche, LP and Glenn M. Plaisance (collectively the "Castex Defendants").[2] The motions are opposed.[3] For the reasons that follow, the Court grants both motions. As a result, only Plaintiffs' claims for declaratory/injunctive relief pursuant to 28 U.S.C. §§ 2201–02 and Plaintiffs' state law claims remain.

## I.     BACKGROUND[4]

On April 29, 2016, Plaintiff Daryl Carpenter, principal and sole owner of Plaintiff Reel Screamers Guide Service, LLC ("Reel Screamers") (collectively "Plaintiffs"), was "guiding a family of three on a red fishing trip," having departed from Grand Isle, Louisiana and navigated to the Golden Pond through a series of "interconnected natural navigable waterways."[5] Carpenter "easily navigated [a] 24 foot charter vessel into the

---

[1] R. Doc. 34.
[2] R. Doc. 31. Plaisance Dragline and Dredging Company, Inc. ("Plaisance Dragline") was also included in Defendants' motion; however, Plaintiffs voluntarily dismissed their claims against Plaisance Dragline with prejudice on October 2, 2017. R. Docs. 60, 63.
[3] R. Doc. 41.
[4] The background is based on the allegations in Plaintiff's First Amended Complaint. R. Doc. 25.
[5] R. Doc. 25 at ¶¶ 15, 16.

Golden Pond, where the crew engaged in fishing with hook and line."[6] While Carpenter was guiding the family of three, Plaisance, who manages the land upon which Golden Pond is situated, approached Carpenter by boat, advising him that he and his passengers "were trespassing on private property and had to leave."[7] Carpenter "begrudgingly" left Golden Pond after this encounter.[8]

On June 6, 2016, Carpenter was driving away from his home in Grand Isle, Louisiana when "his lane of travel was cut off to the front by an unidentified Grand Isle policeman in a marked squad car."[9] Carpenter stopped his vehicle, "at which time the Grand Isle Policeman signaled to a Lafourche Parish Sheriff's vehicle, which pulled up behind Plaintiff's vehicle, blocking him from the rear."[10] Sergeant Provost and Deputy Drake Duet approached Carpenter and explained that Plaisance "was pursuing a complaint against Plaintiff for trespassing."[11] Sergeant Provost informed Carpenter "that this would be his 'first and final official warning,' [and] that if he [were] found on Mr. Plaisance's property again, he would be arrested."[12] Carpenter asked Sergeant Provost "the official location of Mr. Plaisance's property," to which Sergeant Provost responded by stating Carpenter "would be arrested for trespassing if found on 'any waters that the State Lands Map did not show as public.'"[13] According to Plaintiffs, this admonishment "served to prevent Plaintiff's lawful use of numerous natural navigable waterways, including but not limited to the Golden Pond"[14] because the State Lands Map's disclaimer reads in part: "This information

---

[6] *Id.* at ¶ 16.
[7] *Id.* at ¶ 18, 19.
[8] *Id.* at ¶ 20.
[9] *Id.* at ¶ 30.
[10] *Id.* at ¶ 31.
[11] *Id.* at ¶ 34.
[12] *Id.* at ¶ 35.
[13] *Id.* at ¶ 36.
[14] *Id.* at ¶ 40(D).

is intended to serve only as an initial reference for research and does not purport to provide evidence of legal title to property."[15] As a result, Plaintiffs contend they are unable to determine which waters are public and which are private.

On January 31, 2017, Plaintiffs filed suit against the Sheriff Defendants and Castex Defendants.[16] Plaintiffs filed an amended complaint on May 16, 2017.[17] On November 8, 2017, at the Court's direction, Plaintiffs filed a supplemental memorandum referencing the allegations in their amended complaint and clarifying the causes of action being asserted against each Defendant and pointing out the factual allegations supporting each claim.[18]

By reference to their amended complaint, Plaintiffs in their supplemental memorandum clarified that their claims against Sergeant Prevost and Sheriff Webre are brought in both their official and individual capacities based on: (1) Carpenter's June 6, 2016 encounter with Sergeant Prevost, Deputy Duet, and "an unidentified Grand Isle Policeman," during which Sergeant Prevost pulled Carpenter over, "physically block[ing]" his "ingress and egress"[19]; (2) Sergeant Prevost's statement to Carpenter during the June 6, 2016 encounter that Plaisance "was pursuing a complaint against [him] for trespassing,"[20] and warning Carpenter that he "would be arrested for trespassing if found on 'any waters that the State Lands Map did not show as public,'" thereby preventing him from going on public land;[21] and (3) the Sheriff Defendants' conduct that, "coupled with the actions and inactions of Sheriff Craig Webre in other similar cases and matters[, which] evidence a custom, culture, and practice within the Lafourche Parish Sheriff's

---

[15] *Id.* at ¶ 38.
[16] R. Doc. 1.
[17] R. Doc. 25.
[18] R. Doc. 65.
[19] R. Doc. 25 at ¶ 43; R. Doc. 65 at 7.
[20] R. Doc. 25 at ¶ 34; R. Doc. 65 at ¶ 34.
[21] R. Doc. 25 at ¶ 36; R. Doc. 65 at 6.

Department of discrimination against commercial fishermen in favor of landowners and water bottoms claimants."[22]

Plaintiffs' claims against the Castex Defendants are based on Castex Lafourche, LP's authorizing its agent, Plaisance, to inform Plaintiffs they were trespassing and "pursuing a complaint against" them,[23] but permitting others to use the waterways,[24] "thus creating, propagating, and promoting an unfair competitive edge against Plaintiffs."[25]

Finally, Plaintiffs complain Plaisance also violated their constitutional rights by telling Plaintiffs to leave the Castex property and subsequently "pursuing a complaint."[26] According to Plaintiffs' amended complaint and supplemental memorandum, Plaisance "conspired [with the Sheriff Defendants] under color of state law to deprive Plaintiffs of their rights, privileges and immunities."[27]

## II.   CAUSES OF ACTION

### A. The Sheriff Defendants

Plaintiffs bring both individual and official capacity claims against the Sheriff Defendants arising under federal and state law:

> (1) 42 U.S.C. § 1983,[28] specifically "Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures, his Fifth Amendment right to due process, and his Fourteenth Amendment right to equal protection;"[29]
> (2) 15 U.S.C §§ 1, 13, 15 (anti-trust and unfair competition claims);[30]

---

[22] R. Doc. 25 at ¶ 52(A); R. Doc. 65 at 10.
[23] R. Doc. 25 at 34 & ¶ 96; R. Doc. 65 at 5.
[24] R. Doc. 25 at ¶ 97.
[25] *Id.*
[26] R. Doc. 25 at ¶ 34; R. Doc. 65 at 5.
[27] R. Doc. 25 at ¶¶ 55, 56; *see* R. Doc. 65 at 9.
[28] R. Doc. 25 at ¶ 3; R. Doc. 65 at 5.
[29] R. Doc. 65 at 6; *see* R. Doc. 25 at ¶ 71(T)–(W).
[30] R. Doc. 25 at ¶ 3; R. Doc. 65 at 1–3. In their complaint, Plaintiffs also bring a 42 U.S.C. § 1985 claim. R. Doc. 25 at ¶ 21. Based on the factual allegations made in their amended complaint, this statute plainly does not apply in this case, and the Court does not consider this cause of action. *See Cain v. City of New Orleans,* No. 15-4479, 2016 WL 2849498, at *5–6 (E.D. La. May 13, 2016) ("The Court disregards bare assertions of collective responsibility, unsupported by concrete factual allegations.").

(3) "general maritime negligence and intentional tort;"[31]
(4) "Louisiana law negligence/intentional tort;"[32] and
(5) the Louisiana Constitution,[33] "specifically violations of rights secured to him under Article I, Sections 2 (Due process), 3 (Right to Dignity), 4 (Right to Property), 5 (Right to Privacy), 13 (Rights of the Accused), and 27 (Freedom to Hunt, Fish, and Trap)."[34]

## B. The Castex Defendants

Plaintiffs' claims against both Castex Defendants arise under both federal and state law:

(1) "general maritime negligence and intentional tort;"[35]
(2) 15 U.S.C §§ 1, 13, 15 (anti-trust and unfair competition claims);[36] and
(3) "Louisiana law negligence/intentional tort."[37]

Plaintiffs' additional causes of action asserted only against Plaisance arise under

Federal and state law:

(1) 42 U.S.C. § 1983; and
(2) the Louisiana Constitution.[38]

## C. Declaratory/Equitable Relief Against All Defendants

Plaintiffs also seek declaratory/equitable relief against all Defendants under 28 U.S.C.

§§ 2201–02.[39] Specifically, Plaintiffs seek:

(1) "a declaration of the boundary between the public bed of the Golden Pond and other similarly situated navigable waters at issue in this litigation and the private property of CASTEX";[40] or, in the alternative,

(2) "a declaration of their Federal and Louisiana State law rights to navigate, conduct commercial fishing operations, and otherwise engage in interstate maritime commerce upon the Golden Pond and other similarly situated navigable waters at issue in this litigation of which CASTEX asserts ownership."[41]

---

[31] R. Doc. 25 at 32; R. Doc. 65 at 9.
[32] R. Doc. 25 at 35; R. Doc. 65 at 15.
[33] R. Doc. 25 at ¶¶ 6, 75; R. Doc. 65 at 7.
[34] R. Doc. 25 at ¶ 55; R. Doc. 65 at 5, 7.
[35] R. Doc. 25 at 32; R. Doc. 65 at 9.
[36] R. Doc. 25 at ¶ 3; R. Doc. 65 at 1–3.
[37] R. Doc. 25 at 35; R. Doc. 65 at 10–11.
[38] R. Doc. 25 at ¶¶ 59, 69, 75; R. Doc. 65 at 8–9.
[39] R. Doc. 25 at ¶¶ 107, 108.
[40] *Id.* at 107.
[41] *Id.* at 108.

## III.   LEGAL STANDARD

### A.  Dismissal under Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims."[42] A motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) challenges a federal court's subject-matter jurisdiction.[43] Under Rule 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[44] "Lack of subject-matter jurisdiction may be found in the complaint alone, the complaint supplemented by the undisputed facts as evidenced in the record, or the complaint supplemented by the undisputed facts plus the court's resolution of the disputed facts."[45] Thus, in examining a Rule 12(b)(1) motion, the district court is empowered to consider factual matters that may be in dispute.[46] "When, as here, grounds for dismissal may exist under both Rule 12(b)(1) and Rule 12(b)(6), the Court should, if necessary, dismiss only under the former without reaching the question of failure to state a claim."[47]

### B.  Dismissal under Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief may be granted if the plaintiff has not set forth factual allegations in support of his claim that would entitle

---

[42] *In re FEMA Trailer Formaldehyde Products Liab. Litig. (Mississippi Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012).

[43] *See* FED. R. CIV. P. 12(b)(1).

[44] *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted).

[45] *In re FEMA*, 668 F.3d at 287.

[46] *Crane v. Johnson*, 783 F.3d 244, 251 n.21 (5th Cir. 2015); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

[47] *Valdery v. Louisiana Workforce Comm'n*, No. 15-01547, 2015 WL 5307390, at *1 (E.D. La. Sept. 10, 2015).

him to relief.[48] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[49] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[50] However, the court does not accept as true legal conclusions or mere conclusory statements,[51] and "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[52] "[T]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" or "naked assertion[s] devoid of further factual enhancement" are not sufficient.[53]

"Factual allegations must be enough to raise a right to relief above the speculative level."[54] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."[55]

## IV.    THE SHERIFF DEFENDANTS' 12(B)(1) MOTION

The Sheriff Defendants contend Carpenter's § 1983 claims under the Fourth, Fifth, and Fourteenth Amendments, insofar as they are based on the threat of future arrest, must be dismissed for lack of standing.[56] Because Carpenter has not been arrested and may continue

---

[48] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).
[49] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).
[50] *Id.*
[51] *Id.*
[52] *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) (citing *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).
[53] *Iqbal*, 556 U.S. at 663, 678 (citations omitted).
[54] *Twombly*, 550 U.S. at 555.
[55] *Id.* (quoting FED. R. CIV. P. 8(a)(2)).
[56] At best, Plaintiffs contend the Sheriff Defendants' threat of arrest for future trespass violated Carpenter's "Fourth Amendment right to be free from unreasonable searches and seizures, his Fifth Amendment right to due process, and his Fourteenth Amendment right to equal protection, particularly from state action aimed at abridging his due process rights." R. Doc. 65 at 5–6; *see* R. Doc. 25 at ¶¶ 61. 63, 66, 67, 71(A)–(W).

to fish on other waterways that are public, the Sheriff Defendants contend Carpenter has not suffered a redressable injury-in-fact and his claims are not ripe for adjudication.[57]

Standing and ripeness are two doctrines of justiciability that assure federal courts decide only Article III cases or controversies.[58] The "irreducible constitutional minimum" of standing consists of three elements.[59] "To establish standing, a plaintiff must show that: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury."[60] "Where, as here, a case is at the pleading state, the plaintiff must 'clearly . . . allege facts demonstrating' each element."[61]

In their motion to dismiss pursuant to Rule 12(b)(1), the Sheriff Defendants argue Carpenter lacks standing to bring any claims based on the threat of future arrest, as Sergeant Prevost's threat does not constitute a concrete injury-in-fact. The Sheriff Defendants point to two cases, *Kelly v. Herbst*[62] and *Blankenship v. Buenger*,[63] in support of their positions. However, neither *Kelly* nor *Blankenship* apply to the facts of this case. In both of those cases, the plaintiffs brought pre-enforcement actions challenging the constitutionality of the statutes they believed would be enforced against them.[64]

Under the first prong of a court's constitutional standing analysis, a plaintiff must show that he "'has sustained or is immediately in danger of sustaining some direct injury' as

---

[57] R. Doc. 34-1 at 4.
[58] *LeClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005).
[59] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).
[60] *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014).
[61] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).
[62] No. 12-27, 2012 WL 3647428 (D. Mont. May 10, 2012).
[63] 653 F. App'x 330 (5th Cir. 2016).
[64] *See id.* at 332. The Fifth Circuit noted that "Blankenship lacks standing. Our holding rests primarily on the fact that § 30.05 has not yet been applied to Blankenship." *Id.* at 343; *see Kelly*, 2012 WL 3647428, at *2–3.

the result of the challenged official conduct and the injury or threat of injury [is] both 'real and immediate,' not 'conjectural or hypothetical.'"[65] In a suit challenging the constitutionality of a statute pre-enforcement, a plaintiff must prove his future harm is "real and immediate" by demonstrating that (1) he has a concrete plan to violate the law in question; (2) he has received a real threat of imminent prosecution from the state; and (3) that the statute at issue has previously been enforced.[66] Such an analysis, however, applies only when a plaintiff sues for prospective relief by way of an injunction or declaratory judgment.[67]

In this case, Plaintiffs seek prospective relief in the form of (1) "a declaration of the boundary between the public bed of the Golden Pond and other similarly situated navigable waters at issue in this litigation and the private property of CASTEX";[68] or, in the alternative, (2) "a declaration of their Federal and Louisiana State law rights to navigate, conduct commercial fishing operations, and otherwise engage in interstate maritime commerce upon the Golden Pond and other similarly situated navigable waters at issue in this litigation of which CASTEX asserts ownership."[69] The declaratory judgments they seek are not based on the alleged threat of arrest or the constitutionality of any statute they believe might be enforced against them. As a result, neither *Kelly* nor *Blankenship* apply. Instead, the requirements for standing on Plaintiffs' § 1983 claims are that they sufficiently allege that (1) they have suffered a concrete and particularized

---

[65] *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (emphasis added and citations omitted); *see Allen v. Wright*, 468 U.S. 737, 751 (184) ("The injury alleged must be . . . distinct and palpable . . . and not abstract or conjectural or hypothetical.") (internal citations and quotations omitted).

[66] *Susan B. Anthony List*, 134 S. Ct. at 2342; *Blankenship*, 653 F. App'x at 330; *see also Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009).

[67] *See Hightower v. City of Grand Rapids*, 256 F. Supp. 3d 742, 748 (W.D. Mich. 2017 ("While a plaintiff might have standing to seek damages for past injuries, that plaintiff must demonstrate separate standing when seeking declaratory or injunctive relief."); *see also Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542–43 (5th Cir. 2008); *Higgins v. Tex. Dep't of Health Servs.*, 801 F. Supp. 2d 541, 552 (W.D. Tex. 2011).

[68] R. Doc. 25 at ¶ 107.

[69] *Id.* at ¶ 108.

injury-in-fact; (2) the injury is fairly traceable to Defendants' conduct; and (3) a favorable judgment from this Court is likely to redress the alleged injury.[70] Plaintiffs have satisfied these requirements and have standing to bring their § 1983 claims.[71]

## V.    THE SHERIFF DEFENDANTS' 12(B)(6) MOTION

### C.  Plaintiffs' Section 1983 Claims Against the Sheriff Defendants

Plaintiffs' § 1983 claims against the Sheriff Defendants stem from alleged violations of Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights based on (a) Carpenter's June 6, 2016 encounter with Sergeant Prevost, Deputy Duet, and "an unidentified Grand Isle Policeman,"[72] during which Carpenter's "ingress and egress" was "physically blocked"[73]; (b) Sergeant Prevost's statements that deprived Plaintiffs of their right to go on public lands, thereby restraining their ability to earn a living; (c) Sheriff Webre's failure to respond to Plaintiffs' letters;[74] and (d) "the actions and inactions of Sheriff Craig Webre in other similar cases and matters," which Plaintiffs contend "evidence a custom, culture, and practice within the Lafourche Parish Sheriff's Department of discrimination against commercial fishermen in favor of landowners and water bottoms claimants."[75] Plaintiffs bring their § 1983 claims against the Sheriff Defendants in their official and individual capacities.

### 1.  Plaintiffs' Official Capacity Claims Against Sergeant Prevost

With respect to Plaintiffs' § 1983 claims against Sergeant Prevost in his official capacity, it is well settled that a suit against a municipal official in his or her official capacity

---

[70] *See Justice*, 771 F.3d at 291.
[71] To the extent Plaintiffs make factual allegations concerning the threat of arrest in this case, those allegations are not material to the causes of action asserted under § 1983.
[72] R. Doc. 25 at ¶¶ 3, 30, 43; R. Doc. 65 at 5, 7.
[73] R. Doc. 25 at ¶ 43; R. Doc. 65 at 7.
[74] R. Doc. 25 at ¶¶ 44–48; R. Doc. 65 at 7.
[75] R. Doc. 25 at ¶¶ 52, 52A, 60, 65K; R. Doc. 65 at 8–9.

is simply another way of alleging municipal liability.[76]  Louisiana grants no capacity to be sued to any parish sheriff's office.  The Sheriff in his official capacity is the appropriate governmental entity responsible for any violations committed by his office.[77] When, as in this case, the Sheriff is a defendant in the litigation, claims against specific deputies in their official capacities are redundant, and it is appropriate to dismiss them.[78] As a result, the Court dismisses Plaintiffs' claims against Sergeant Prevost in his official capacity.[79]

### 2.  Plaintiffs' Individual Capacity Claims Against Sergeant Prevost

Plaintiffs allege Sergeant Prevost violated their Fifth Amendment right to due process and Fourth Amendment right to be free from unreasonable searches and seizures.[80] Sergeant Prevost contends he is entitled to qualified immunity as to each of these claims.

The qualified immunity defense serves to shield government officials, sued in their individual capacities and performing discretionary functions, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[81] "A court required to rule upon the qualified immunity issue must [first] consider" whether, taken in the light most favorable to the plaintiff, "the facts alleged show the officer's conduct violated a constitutional right."[82] "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning

---

[76] *Monell v. New York City Dept. of Social Servs*, 436 U.S. 658 (1978).
[77] *Winfrey v. San Jacinto Cty.*, 481 F. App'x 969, 976 (5th Cir. 2012); *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So. 2d 669, 671 (La. 1981).
[78] *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001).
[79] *See id.*
[80] Plaintiffs also assert a Fourteenth Amendment Equal Protection claim against Sergeant Prevost; however, Plaintiffs make no factual allegations against Sergeant Prevost to substantiate this claim. As a result, the Court dismisses this claim against Sergeant Prevost for failure to state a claim. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.
[81] *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004).
[82] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

qualified immunity."[83] If the complaint makes out a constitutional violation, the Court then must determine whether that constitutional right was clearly established at the time the violation occurred.[84] To be "clearly established" for the purpose of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[85]

When considering a qualified immunity defense raised in the context of a Rule 12(b)(6) motion to dismiss, the Court must determine whether "the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity."[86] "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity."[87]

Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[88] For a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"[89] "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[90] "Officials should receive the protection of qualified immunity 'unless the law is clear in the more particularized sense that reasonable officials should be

---

[83] *Id.*

[84] *Id.*

[85] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[86] *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012); *Jordan v. City of New Orleans*, No. 15-1922, 2016 WL 633666, at *2 (E.D. La. Feb. 17, 2016).

[87] *Backe*, 691 F.3d at 648; *see also Babb v. Dorman*, 33 F.3d 472, 475 n.5 (5th Cir. 1994) ("To survive a motion to dismiss in cases where the qualified immunity defense is raised, a plaintiff must state facts, which if proven, would defeat the defense."); *Jackson v. City of Beaumont Police Dep't*, 958 F.2d 616, 620 (5th Cir. 1992).

[88] *White v. Pauly*, 137 S. Ct. 548, 549 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

[89] *Id.*

[90] *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Anderson*, 483 U.S. at 640).

put on notice that their conduct is unlawful.'"[91] "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[92] "The court's focus, for purposes of the 'clearly established' analysis should be on 'fair warning': qualified immunity is unavailable 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[93]

### a. Fifth and Fourteenth Amendment Substantive Due Process Claim

Carpenter alleges Sergeant Prevost violated his Fifth Amendment right to due process when he "physically blocked" Carpenter's "pathway, ingress and egress"[94] and "curtly responded" that Carpenter would be considered trespassing "if found on 'any waters that the State Lands Map did not show as public'" after Carpenter "inquired as to the official location of Mr. Plaisance's property" on June 6, 2016.[95]

The Fifth Amendment's "Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures."[96] This constitutional provision, on its own, is enforceable only against the Federal Government.[97] Thus, the Court assumes Carpenter asserts his due process claim through the Fourteenth Amendment.[98]

Carpenter's first due process allegation is that Sergeant Prevost's blocking his movement on June 6, 2016 violated Carpenter's constitutionally protected liberty interest

---

[91] *Id.* at 393 (quoting *Kinney*, 367 F.3d at 350).
[92] *White*, 137 S. Ct. at 549.
[93] *Wernecke*, 591 F.3d at 392 (5th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).
[94] R. Doc. 25 at ¶ 43; R. Doc. 65 at 7.
[95] R. Doc. 25 at ¶ 36; R. Doc. 65 at 5–6.
[96] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).
[97] *Palko v. Connecticut*, 302 U.S. 319, 324–25 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969).
[98] *Id.*

to be free from unreasonable seizures.[99] "[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior," in this case the Fourth Amendment, "that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."[100] Because in this case Carpenter's substantive due process claim with respect to this conduct fully overlaps with his Fourth Amendment unreasonable seizure claim, his due process claim based on this conduct must be dismissed.[101]

Carpenter's second due process allegation is that Sergeant Prevost deprived Carpenter of his constitutionally protected liberty interest to remain in a public place by informing him he would be considered trespassing should he be found on property marked as private on the State Lands Map. The principle that an individual possesses a constitutionally protected liberty interest to remain in a public place is clearly established.[102] For example, in *City of Chicago v. Morales*, the U.S. Supreme Court explained that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."[103] "Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage.'"[104]

Each of the liberty interests articulated by the U.S. Supreme Court emphasizes the right to *remain* in a *public* place. This right plainly does not extend to private property.[105]

---

[99] The Court assumes Carpenter alleges Sergeant Prevost's conduct deprived him of his liberty, as Carpenter clearly does not allege he was deprived of life or property.
[100] *Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (citation omitted).
[101] *Id.*; *see also Willis v. Town of Marshall*, 426 F.3d 251, 266 (4th Cir. 2005).
[102] *See City of Chicago v. Morales*, 527 U.S. 41, 54 (1999); *Williams v. Fears*, 179 U.S. 270, 274 (1900); *Papachristou v. Jacksonville*, 405 U.S. 156, 164 (1972); *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965).
[103] *City of Chicago*, 527 U.S. at 53.
[104] *Id.* at 54 (quoting *Kent v. Dulles*, 357 U.S. 116, 126 (1958)).
[105] *See, e.g.*, *State in the Interest of J.A.V.*, 558 So. 2d at 215 (holding that La. R. S. 14:63.3, which prohibits trespassing, is not unconstitutionally vague).

In this case, Carpenter does not make a procedural due process claim that he was removed from a public place without due process; rather he makes a substantive due process claim stemming from his being told he may not trespass on lands marked as private on the State Lands Map. At base, Carpenter's complaint is that, because of the State Lands Map's disclaimer, it is possible that some areas marked as "private" are actually "public" and, therefore, Sergeant Prevost's warning deprived Carpenter of his constitutionally protected liberty interest to *travel to* a public place.

In a situation in which the officer has the opportunity to consider the potential consequences of his or her actions,[106] as in this case, to state a claim for relief under the Fourteenth Amendment's substantive due process clause, a plaintiff must allege the officer acted with deliberate indifference.[107] The deliberate indifference standard requires an officer's conscious disregard of a "risk that a violation of a particular constitutional right . . . will follow [his or her] decision."[108] Stated otherwise, to overcome a motion to dismiss, a plaintiff must allege that the officer understood the potential consequences of his or her actions, but nevertheless made the "'conscious' choice to endanger [the plaintiff's] constitutional rights."[109] This is because "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."[110]

---

[106] Such as, for example, an officer's decisions made during a high speed chase. *See Lewis*, 523 U.S. at 853 (distinguishing situations where public officers have the "time to make unhurried judgments" from situations where "unforeseen circumstances demand an officer's instant judgment.").

[107] *Id.*

[108] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997).

[109] *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008) (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)).

[110] *Lewis*, 523 U.S. at 853 ("To recognize a substantive due process violation in these circumstances when only midlevel fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986))).

"In the context of law enforcement, the requisite conduct proscribed by the substantive due process clause has been described as that which 'shocks the conscience' when the conduct is 'brutal and offensive to human dignity' and is among the 'most egregious official conduct.'"[111] Most cases applying this standard have involved allegations of egregious conduct that do not otherwise fit the mold of a claim falling under a more specific constitutional right.[112] For example, in *Checki v. Webb*, the Fifth Circuit explained that "where a police officer uses a police vehicle to terrorize a civilian, and he has done so with malicious abuse of official power shocking to the conscience, a court may conclude that the officers have crossed the 'constitutional line,'" thereby violating that civilian's Fourteenth Amendment right to due process.[113] Similarly, the Eighth Circuit in *Rogers v. City of Little Rock* found the case of an officer who raped a woman in her home after stopping her for a traffic violation did "not fit the mold of a typical fourth amendment search and seizure case," but rather violated the victim's "due process right to be free from physical abuse or sexual assault by state actors."[114] At bottom, in each case in which a due process violation was found, there was "stunning evidence of arbitrariness and caprice that extend[ed] beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme."[115]

---

[111] *Vicknair v. La. Dep't of Wildlife & Fisheries*, No. 6:11–0184, 2013 WL 1180834, at *14 (W.D. La. Jan. 28, 2013) (quoting *United States v. Fernandez*, 559 F.3d 303, 330 (5th Cir. 2009)).

[112] *See, e.g.*, *Shillingford v. Holmes*, 634 F.2d 263, 264–65 (5th Cir. 1981) (police officer intentionally struck tourist because he was photographing the officer and fellow officers apprehending a boy on the street during a Mardi Gras parade) (noting that, although the Fourth Amendment guarantees "the right of the people to be secure in their persons," "[a] law enforcement officer's infliction of personal injury on a person by the application of undue force may deprive the victim of liberty without due process of law"), *abrogated on other grounds by Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993).

[113] 785 F.2d 534, 538 (5th Cir. 1986); *see also Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1071, 1075–76 (11th Cir. 2000) (student blinded in one eye when a coach intentionally hit him in the head with a metal weight); *Hemphill v. Schott*, 141 F.3d 412, 418–19 (2d Cir. 1998) (police officer provided assistance to a third party in shooting the plaintiff).

[114] 152 F.3d 790, 797 (8th Cir. 1998).

[115] *Doe v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 868 (5th Cir. 2012) (citing *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)).

At minimum, Carpenter must allege facts sufficient for the Court to infer Sergeant Prevost acted with deliberate indifference to the potential effects of his conduct on Carpenter's constitutional rights.[116] In this case, Carpenter alleges the Sheriff Defendants violated his right to substantive due process when Sergeant Prevost told Carpenter not to trespass on lands marked as private on the State Lands Map. The Court finds Sergeant Prevost did not act with deliberate indifference when he informed Carpenter that he would be considered trespassing if found on private lands, as his alleged conduct does not "shock[] the conscience," is not "brutal and offensive to human dignity," and is not "among the 'most egregious official conduct.'"[117] At best, Sergeant Prevost's actions evidence a "lack of due care," which is not sufficient to state a due process claim.[118] Carpenter's Fourteenth Amendment due process claim based on this conduct is dismissed.

### b. Fourth Amendment Seizure Claim

Carpenter next alleges Sergeant Prevost violated his Fourth Amendment right to be free from unreasonable searches and seizures when he pulled Carpenter over on June 6, 2016, "physically block[ing]" Carpenter's "pathway, ingress and egress."[119] The Fourth Amendment protects individuals from unreasonable searches and seizures.[120] "Traffic

---

[116] *Farmer v. Brennan*, 511 U.S. 825, 837, 842–43 (1994) (observing that deliberate indifference can be inferred merely from the obviousness of the risk, such as when prior incidents are pervasive or well-documented and circumstances suggest that the defendant was aware of them); *cf. Ball v. LeBlanc*, 792 F.3d 84, 594–95 (holding that the defendants were aware of the risk posed by high temperatures even though they argued no inmate had ever suffered a heat-related incident at the subject facility).

[117] *Fernandez*, 559 F.3d at 330.

[118] *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (noting "the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care"). To the extent Carpenter alleges a violation of his right to *procedural* due process, Louisiana's trespass statute "requires a reasonably contemporaneous or written request to leave as an indispensable element of the offense." *State v. Johnson*, 381 So. 2d 498, 500 (La. 1980). Thus, prior to being arrested for trespass, if ever, Carpenter would first receive a warning that he was in fact trespassing, the State Lands Map's disclaimer notwithstanding.

[119] R. Doc. 25 at ¶ 43; R. Doc. 65 at 7.

[120] *See* U.S. CONST. amend. IV.

stops are considered seizures within the meaning of the Fourth Amendment."[121] For the traffic stop to be justified at its inception, an officer must possess "an objectively reasonable suspicion that some sort of illegal activity . . . occurred, or is about to occur, before stopping the vehicle."[122] "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the . . . seizure."[123] To determine whether the seizure was reasonable, courts consider "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[124]

There are exceptions to the general rule that an officer must first have "an objectively reasonable suspicion that some sort of illegal activity . . . occurred, or is about to occur, before stopping the vehicle."[125] As the U.S. Supreme Court in *Illinois v. Lidster* explained, the suspicionless stop of an automobile does not require a court to apply a "rule of automatic unconstitutionality," as "the fact that such stops lacks individualized suspicion cannot by itself determine the constitutional outcome."[126] In the context of checkpoints, for example, "brief, suspicionless seizures at highway checkpoints for the purposes of combating drunk driving and intercepting illegal immigrants" do not violate the Fourth Amendment.[127]

---

[121] *United States v. Banuelos–Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (citing *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (second citation omitted)).

[122] *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted).

[123] *Id.* (citing *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002)).

[124] *Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450–55 (1990) (citation omitted)); *see also United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).

[125] *Lopez–Moreno*, 420 F.3d at 430 (citation omitted).

[126] 540 U.S. 419, 424 (2004).

[127] *City of Indianapolis v. Edmond*, 531 U.S. 32, 34 (2000).

The legality of a suspicionless seizure depends on whether the seizure is premised on specific "highway safety interests [or] the general interest in crime control."[128] In *Michigan State Police Department v. Sitz*,[129] the U.S. Supreme Court held that because the checkpoint in question "was clearly aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue," the Michigan Highway Patrol's custom of conducting suspicionless stops on the highway did not violate the Constitution.[130] In contrast, in *Delaware v. Prouse*[131] the Court invalidated "a discretionary, suspicionless stop for a spot check of a motorist's driver's license and vehicle registration"[132] because officers enforcing the stop had "standardless and unconstrained discretion" to carryout the program. In *Prouse*, the Government offered "the apprehension of stolen motor vehicles" as an alternative explanation for the practice being necessary.[133] In rejecting this argument, the Court noted the "interest in controlling automobile thefts is not distinguishable from the general interest in crime control."[134] Accordingly, a "general interest in crime control" cannot justify a suspicionless stop.[135]

The U.S. Court of Appeals for the Ninth Circuit noted another exception to the general rule in *United States v. Faulkner*.[136] In *Faulkner* the Ninth Circuit held that a checkpoint on a public campground used for the "primary purpose" of providing "information to visitors to the recreation area of the regulations governing its use, which

---

[128] *Id.* at 40.
[129] 496 U.S. 444 (1990).
[130] *Edmond*, 531 U.S. at 39.
[131] 440 U.S. 648, 663 (1979).
[132] *Edmond*, 531 U.S. at 39.
[133] *Delaware v. Prouse*, 440 U.S. 648, 659 (1979).
[134] *Id.*
[135] *Edmond*, 531 U.S. at 41 ("Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life.").
[136] 450 F.3d 466 (9th Cir. 2006).

include but are not limited to the possession or consumption of alcohol" did not violate the Fourth Amendment.[137] In concluding no Fourth Amendment violation had occurred, the court noted that the primary purpose of this checkpoint was not to "advance 'the general interest in crime control,'"[138] within the meaning of *Prouse*, but rather the suspicionless stops served a "premeditated regulatory purpose."[139]

As this Court previously stated, "in judging reasonableness" courts should consider "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[140] "A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."[141]

In this case, the officers did not justify their stop of Carpenter by arguing they held a reasonable suspicion that a crime had been or would be committed, nor did they justify their stop by claiming it was to gather information. Instead, they stopped Carpenter for the sole purpose of *disseminating* information. First, "[w]ere the court to approve of a rule wherein law enforcement officers were free to conduct a traffic stop of any individual with whom an officer has something to say, the Fourth Amendment protections presently available to motorists would be immediately and greatly diminished."[142] Second, the public interest in allowing police officers to stop motorists to issue trespass warnings is minimal, as law enforcement agencies have myriad less intrusive ways in which to disseminate the information, such as by mail or telephone. Finally, "[t]he [U.S. Supreme]

---

[137] *Id.* at 468–69, 474.
[138] *Id.* at 470.
[139] *Id.*
[140] *Lidster*, 540 U.S. at 427 (citing *Sitz*, 496 U.S. at 450–55 (citation omitted)); *see also Brigham*, 382 F.3d at 506.
[141] *Id.* (citing *Sitz*, 496 U.S. at 450–55 (citation omitted)); *Brown v. Texas*, 443 U.S. 47, 51 (1979).
[142] *Vincent v. City of Sulphur*, 28 F. Supp. 3d 626, 648 (W.D. La. 2014).

Court has defined the severity of the subjective intrusion on individual liberty as measured by the amount of concern and fright that is generated on the part of lawful travelers."[143] Unlike *Faulkner* and *Sitz*, the stop was not part of a regulated checkpoint, which "is inherently of a less frightful nature than an ordinary seizure, such as a roving-patrol stop."[144] Moreover, the stop was not a part of a systematic plan put in place by the police department. Like the plaintiffs in *Prouse*, Carpenter was "subject to . . . the unfettered discretion of officers in the field."[145] The Court finds the practice of stopping a vehicle to provide its passenger with a no-trespass warning is plainly more akin to serving a "general interest in crime control," than specific "highway safety interests."[146] As a result, the Court finds Carpenter's Fourth Amendment right to be free from unreasonable seizure was violated in this case.

Although Sergeant Prevost's actions in stopping Carpenter to issue a no trespass warning violated Carpenter's Fourth Amendment rights, the Court finds this right was not clearly established at the time the violation occurred. In defining the contours of the "clearly established" requirement, the Fifth Circuit has stated that, in determining whether a right allegedly violated was clearly established at the time of the alleged violation, a court must "be able to point to 'controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.'"[147] On the issue of how specific the right in question must be defined, the Supreme Court has "repeatedly" cautioned that generalizations and abstract

---

[143] *Faulkner*, 450 F.3d at 473 (citing *Lidster*, 540 U.S. at 427–28; *Prouse*, 440 U.S. at 653–54; *Martinez-Fuerte*, 428 U.S. at 558).

[144] *Id.*

[145] *Prouse*, 440 U.S. at 661; *see also Brown*, 443 U.S. at 51.

[146] *See Edmond*, 531 U.S. at 34.

[147] *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (citing *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc)).

propositions are not capable of clearly establishing the law: "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."[148] Instead, the dispositive question is whether "in light of the specific context of the case, not as a broad general proposition,'" the right was clearly established— "[s]uch specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'"[149]

The Court finds guidance in *Prouse*, in which the U.S. Supreme Court framed the right in question as:

> whether it is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law.[150]

---

[148] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (stating the Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality"); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (holding that the clearly-established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition"). For example, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the U.S. Supreme Court held the Tenth Circuit's framing of the issue in that case as the "right to be free in one's home from unreasonable searches and arrests" was too vague. Rather, the right was more appropriately framed as "the right to be free from the warrantless entry of police officers into one's home to effectuate an arrest after one has granted voluntary, consensual entry to a confidential informant and undertaken criminal activity giving rise to probable cause," which the Court concluded was not clearly established at the time the violation occurred. *Id.* at 231, 244–45 (referring to the right as the "consent-once-removed" doctrine); *see also Gonzalez v. Huerta*, 826 F.3d 854, 857–58 (5th Cir. 2016) (concluding that the district court's framing of the right as requiring "a police officer's demand for identification . . . be based on reasonable suspicion" was "precisely the type of 'general proposition' that the Supreme Court has rejected" (citing *al-Kidd*, 563 U.S. at 731)).

[149] *Mullenix*, 136 S. Ct. at 308–09 (reversing the court of appeals, which held it was clearly established that "a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others,'" finding the circuit court had failed to analyze whether the right was clearly established "in light of the specific context of the case").

[150] *Prouse*, 440 U.S. 648, 650 (1979).

Bearing in mind the particularized nature of the way in which the Court framed the issue in *Prouse*, in this case the Court must determine whether it is clearly established that stopping an automobile for the sole and singular purpose of disseminating information to its passengers is an unreasonable seizure under the Fourth and Fourteenth Amendments.

The Court's review of the case law reveals that only a single district court in this circuit has held that a police officer's stopping a motorist "for the sole and singular purpose of delivering a no trespass warning to him" violates the Fourth Amendment.[151] However, without more than one district court opinion, which the Court notes is not "controlling,"[152] a person's right to be free from police officers' stopping his or her automobile for the purpose of disseminating information to its passengers is not clearly established.[153] With no controlling authority "specifically prohibit[ing] the defendants conduct," no "clearly established law [has] put the constitutionality of [Sergeant Prevost's] actions beyond debate."[154] Thus, Sergeant Prevost is entitled to qualified immunity, and Plaintiffs' Fourth Amendment claims against Sergeant Prevost in his individual capacity must be dismissed.

---

[151] *Vincent*, 28 F. Supp. 3d at 648.

[152] *See, e.g.*, *Bishop v. City of Galveston*, No. 11-4152, 2013 WL 960531, at *12 (S.D. Tex. Mar. 12, 2013) ("[T]his Court first notes it is not bound by another district court decision."), *aff'd* 595 F. App'x 372 (5th Cir. 2014); *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) (explaining that a district court is not bound by another district court's decision, or even an opinion by another judge of the same district, only by its own appellate court and the Supreme Court); *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987).

[153] The Court's research did not reveal any Fifth Circuit, Louisiana State Supreme Court, or U.S. Supreme Court opinion with such a holding. In fact, although the district court in Vincent found the stop violated the Fourth Amendment, it ultimately found the officers in that case were entitled to qualified immunity, as the right to be free from such as stop was not clearly established. 28 F. Supp. at 648.

[154] *See Morgan*, 659 F.3d at 371–72.

### 3. Plaintiffs' Official Capacity Claims Against Sheriff Webre

### a. Plaintiffs' *Monell* Claim under § 1983

A municipality may be liable under § 1983 if it "subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation."[155] To prevail on a § 1983 claim against a local government or municipality, a plaintiff must establish: (1) an official policy or custom, of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.[156] An "official policy" for purposes of § 1983 includes: (1) "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority"; (2) a persistent and widespread practice of city officials or employees, "which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy";[157] and (3) in some circumstances, "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'"[158]

Plaintiffs' municipality liability or *Monell* claim in this case is based on (1) Sergeant Prevost's pulling Carpenter over and telling him that Plaisance was "pursuing a complaint against [Carpenter]"; (2) Sheriff Webre's failure to respond to Carpenter's letters to Sheriff Webre "specifically requesting 'guidance on where the boundaries of Mr. Plaisance's property are' or, 'At the minimum, . . . some official guidance on how I may, while on the open waters of this parish, determine where I can and cannot navigate my

---

[155] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted).
[156] *Valle v. City of Hous.*, 613 F.3d 536, 541–42 (5th Cir. 2010).
[157] *Brown v. Bryan Cty.*, 219 F.3d 450, 457 (5th Cir. 2000). "Actual or constructive knowledge of such [a] custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984).
[158] *Bryan Cty.*, 520 U.S. at 406 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)).

vessel for commercial purposes'";[159] and (3) "other similar cases and matters," all of which Carpenter alleges "evidence a custom, culture, and practice within the Lafourch [sic] Parish Sheriff's Department of discrimination against commercial fishermen in favor of landowners and water bottoms claimants,"[160] in violation of the United States' and Louisiana's "strong public policy."[161]

Carpenter points to no official policy in his complaint, and must therefore allege sufficient facts to demonstrate the Lafourche Parish Sheriff's Office's policy of "discriminat[ing] against commercial fishermen in favor of landowners and water bottoms claimants" by pointing to a pattern or practice of discriminatory conduct. "The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."[162] Specific facts demonstrating a municipality's liability under *Monell* pursuant to a pattern of practice include, for example, "past incidents of misconduct to others,"[163] or "multiple harms that occurred to the plaintiff [himself]."[164]

Plaintiffs do not base their *Monell* claim on the Lafourche Parish Sheriff's Office's violations of other commercial fishermen's rights, other than to allege "other similar cases

---

[159] R. Doc. 25 at ¶ 44.

[160] *Id.* at ¶ 52(A).

[161] *Id.* at ¶ 55(A).

[162] *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire v. Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992)).

[163] *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 843–44 (S.D. Tex. 2011) (citing *Oporto v. City of El Paso*, No. 10-110, 2010 WL 3503457, at *8 (W.D. Tex. Sept. 2, 2010) (refusing to dismiss a failure-to-train claim where plaintiffs alleged thirty-two prior incidents of officers using excessive deadly force); *Sagan v. Sumner County Board of Educ.*, 726 F. Supp. 2d 868, 887 (M.D. Tenn. 2010) (refusing to dismiss a failure-to-train claim where plaintiff alleged that abuse by teacher had occurred numerous times over the course of more than one academic year)).

[164] *Id.* (citing *Michael v. County of Nassau*, No. 09-5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010) (refusing to dismiss failure-to-train claim in part because plaintiff alleged he had faced multiple incidents of misconduct over a long, continuous time period)).

and matters" demonstrate such discrimination.[165] Moreover, Plaintiffs do not allege a sufficient number of similar violations of their own rights to demonstrate the underlying constitutional violation,[166] if any, is widespread.[167] "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'"[168] Because Plaintiffs have failed to establish a pattern or practice of discrimination, they have failed to state a claim for municipal liability upon which the Court may grant relief, and these claims must be dismissed.

### b. Fourteenth Amendment Equal Protection Claim

Carpenter and Reel Screamers next allege Sheriff Webre violated their Fourteenth Amendment right to equal protection. In support of their equal protection claim, Plaintiffs point to Carpenter's June 2016 correspondence directed to "Lafourche Parish Sheriff Craig Webre specifically requesting 'guidance on where the boundaries of Mr. Plaisance's property are' or, 'At the minimum, . . . some official guidance on how [he] may, while on the open waters of this parish, determine where [he] can and cannot navigate [his] vessel for commercial purposes,'"[169] to which he received no response. Plaintiffs contend Sheriff Webre has a history "of discrimination against commercial fishermen in

---

[165] R. Doc. 25 at ¶ 52(A). The allegation that "other similar cases and matters" does not overcome *Twombly* and *Iqbal*'s pleading requirements. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

[166] The third prong requires a plaintiff to prove "moving force" causation. To succeed, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bryan Cty.*, 520 U.S. at 404.

[167] *See McConney v. City of Hous.*, 863 F.2d 1180, 1184 (5th Cir. 1989) ("A pattern requires 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'"); *Valle*, 613 F.3d at 541–42; *City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

[168] *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Webster*, 735 F.2d at 842).

[169] R. Doc. 25 at ¶ 44.

favor of landowners and water bottoms claimants,"[170] as evidenced by the lack of response to these letters and "other similar cases and matters."[171]

The Fourteenth Amendment states "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."[172] "[E]ssentially . . . all persons similarly situated should be treated alike."[173] To plead such a claim, "a plaintiff typically alleges that he 'received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"[174] To state a claim under the Equal Protection Clause, a § 1983 plaintiff must either allege that (a) "a state actor intentionally discriminated against [him] because of membership in a protected class," or (b) he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[175]

Because Plaintiffs do not allege they are members of a protected class, they apparently make a "class of one" equal protection claim.[176] In *Village of Willowbrook v. Olech*, the Supreme Court held that the Equal Protection Clause can give rise to a cause of action on behalf of a 'class of one,' even when the plaintiff does not allege membership in a protected class or group.[177] To state a class of one equal protection claim, a plaintiff must offer a comparator he contends is similarly situated, but treated more favorably for

---

[170] *Id.* at ¶ 52(A).

[171] *Id.* Plaintiffs also assert this claim against Sergeant Prevost; however, Plaintiffs make no factual allegations against Sergeant Prevost to substantiate this claim. As a result, the Court dismisses this claim against Sergeant Prevost for failure to state a claim. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

[172] U.S. CONST. amend. XIV, § 1.

[173] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 212 (5th Cir. 2009) (citing *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993)) (internal quotations and additional citations omitted).

[174] *Id.* at 212–13 (citing *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001)).

[175] *Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 238 (5th Cir. 2012) (internal citations omitted).

[176] *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (finding the plaintiffs properly alleged they had been treated differently from other similarly situated property owners); *Gil Ramirez Grp., LLC v. Houst. Indep. Sch. Dist.*, 786 F.3d 400, 419 (5th Cir. 2015) (explaining that an equal protection claim depends on either identifying a class or showing that the aggrieved party is a "class of one").

[177] *Olech*, 528 U.S. at 563–64.

no rational purpose.[178] In this case, Plaintiffs have made no allegation that the Lafourche Parish Sheriff's Office treated them differently than others who are similarly situated.[179] Accordingly, this claim is dismissed.

### 4. Plaintiffs' Individual Capacity Claims Against Sheriff Webre

With respect to Plaintiffs' § 1983 claim against Sheriff Webre in his individual capacity based on Sergeant Prevost's June 6, 2016 traffic stop, Plaintiffs have not alleged Sheriff Webre had any direct, personal involvement with respect to the seizure.[180] As a result, the Court dismisses Plaintiffs' claims against Sheriff Webre in his individual capacity.[181]

### D. Plaintiffs' Sherman Act Claims Against the Sheriff Defendants

Plaintiffs allege the Sheriff Defendants' conduct demonstrates a "collaborative effort between PLAISANCE, SGT. PREVOST, SHERIFF WEBRE, and by extension, CASTEX, to restrain Plaintiffs' interstate trade in violation of the Anti-Trust laws,"[182] specifically 15 U.S.C. § 1 (the "Sherman Act").[183]

---

[178] *Monumental Task Comm., Inc. v. Foxx*, No. 15-6905, 2016 WL 5780194, at *3 (E.D. La. Oct. 4, 2016) (citing *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007)).

[179] *See XP Vehicles, Inc. v. Dept. of Energy*, 118 F. Supp. 3d 38, 78 (D.C. Cir. 2015) (finding plaintiffs' complaint did not contain sufficient allegations to survive defendant's 12(b)(6) motion to dismiss where there were no other similarly situated parties). As the Court previously noted, the allegation that Sheriff Webre's conduct in "other similar cases and matters" evidence his discrimination against commercial fishermen, without more, does not overcome *Twombly* and *Iqbal*'s pleading requirements. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

[180] *See Winfrey*, 481 F. App'x at 976 n.6 ("The individual-capacity suit against Wright also fails because nothing in the record shows that Wright had any direct, personal involvement . . . ."); *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983); *see also Jenkins*, 402 So. 2d at 671 ("[I]f the sheriff as an employer is to be held vicariously liable for the torts of his employee, he is liable only because he is sheriff and is only liable to the extent that he holds that office. He is not liable personally, and his personal funds and property cannot be subjected to execution of a judgment decreeing that liability." (footnote omitted)).

[181] *See Winfrey*, 481 F. App'x at 976; *Jenkins*, 402 So. 2d at 671.

[182] R. Doc. 65 at 4, 6, 7, 8, 9, 10; *see* R. Doc. 25 at ¶¶ 58(BB); 59(H); 72; 93–99.

[183] R. Doc. 65 at 1–3; R. Doc. 25 at ¶¶ 3, 61 (alleging various violations of the "Commerce Clause"). Plaintiffs also cite to 15 U.S.C. §§ 13, 15 in their complaint. R. Doc. 25 at ¶ 3. The Robinson Patman Act makes it unlawful under certain circumstances "to discriminate in price between different purchasers of commodities of like grade and quantity." 15 U.S.C. § 13(a). Other provisions of the Robinson Patman Act also in general denounce similar discrimination between purchasers of goods with respect to commissions regarding such purchases, or in the payment for or furnishing of services or facilities. 15 U.S.C. §§ 13(c), (d) & (e). No such price (or commission or services or facilities) discrimination is alleged in the complaint. Therefore, this claim is dismissed. *See Norris v. Hearst Trust*, 500 F.3d 454, 463 (5th Cir. 2007). Similarly, the Clayton Act, 15 U.S.C. § 15(a), provides a private damage action (treble damages) for any person "injured

The Sherman Act prohibits all agreements that restrain trade.[184] To establish a Sherman Act violation under § 1, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade "among the several States, or with foreign nations," and (3) trade was restrained in the relevant market."[185]

To satisfy the first element, that the defendants conspired to restrain the plaintiff's trade, Plaintiffs must show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'"[186] Concerted action may be shown by either direct or circumstantial evidence. Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences to support a conspiracy claim.[187] Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1.[188]

Plaintiffs' amended complaint fails to demonstrate that an essential element of the Sherman Act is met in this case,[189] as Plaintiffs do not "allege any specific facts demonstrating an intention on the part of [Defendants], or any other party to engage in a conspiracy."[190] Plaintiffs' amended complaint, as clarified by their supplemental memorandum, alleges that "Defendants collectively have combined in the form of trust or otherwise, and/or conspired in restraint of interstate trade or commerce upon the waters at issue in this matter and have further generated unfair competition upon the

---

in his business or property by reason of anything forbidden in the antitrust laws." Because the Court finds Plaintiffs have not made out a claim for relief based on Anti-Trust, the Court dismisses Plaintiffs' claim for treble damages under the Clayton Act.

[184] *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 342 (1982).

[185] *Apani Sw., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002).

[186] *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

[187] *See Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007).

[188] *See Twombly*, 550 U.S. at 556–57.

[189] *Id.* at 555; *Cuvillier*, 503 F.3d at 401.

[190] *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014).

navigable waters of the United States."[191] In support of their conspiracy claim, they point to: (1) the fact that, while Plaintiffs were on Golden Pond, Plaisance "claimed that he managed the land in that area, that [Carpenter] and his clients were trespassing on private property, and that they had to leave";[192] (2) Sergeant Prevost's telling Carpenter he would be arrested "if found on 'any waters that the State Lands Map did not show as public,'" which "prohibited Plaintiff from access to untold navigable waters on a statewide basis"[193]; (3) Carpenter's June 6, 2016 encounter with Sergeant Prevost, Deputy Duet, and "an unidentified Grand Isle Policeman," during which Sergeant Prevost pulled Carpenter over, "physically block[ing]" Carpenter's "ingress and egress"[194]; (4) Sheriff Webre's failure to respond to Plaintiffs' letters "requesting 'guidance on where the boundaries of Mr. Plaisance's property are'"[195]; (5) the fact that Plaisance, as Castex Lafourche, LP's agent, "ran [Plaintiffs] off" Golden Pond, despite having "personal and actual knowledge of the navigability of Golden Pond and other water bodies in the area"[196]; and (6) the fact that Sheriff Webre "had full knowledge" of Sergeant Prevost's having stopped Carpenter on June 6, 2016 "directly and by way of Plaintiffs' correspondence."[197]

The Sheriff Defendants and the Castex Defendants' individual acts and the circumstantial evidence Plaintiffs offer to demonstrate their concerted efforts do not support an inference that the parties conspired to restrain Plaintiffs' trade. Parallel conduct, without more, is not enough to state a Sherman Act § 1 conspiracy claim.[198] Thus,

---

[191] R. Doc. 25 at ¶ 98; R. Doc. 65 at 4, 6, 7, 8, 9, 10.
[192] R. Doc. 25 at ¶ 19; R. Doc. 65 at 4.
[193] R. Doc. 25 at ¶ 40(C); R. Doc. 65 at 6–7.
[194] R. Doc. 25 at ¶ 43; R. Doc. 65 at 7.
[195] R. Doc. 25 at ¶ 44; R. Doc. 65 at 7–8.
[196] R. Doc. 65 at 8–9; *see* R. Doc. 25 at ¶¶ 29, 34.
[197] R. Doc. 25 at ¶ 48; R. Doc. 65 at 9–10.
[198] *See Twombly*, 550 U.S. at 556–57.

Plaintiffs have failed to sufficiently allege the first element in a Sherman Act conspiracy claim that Defendants made "a conscious commitment to a common scheme designed" to restrain Plaintiffs' trade.[199]

Even assuming Plaintiffs did sufficiently allege the Sheriff Defendants "conspired" to restrain Plaintiffs' trade, Plaintiffs also must sufficiently allege that the conspiracy had the effect of restraining interstate trade. Plaintiffs allege no facts to substantiate their assertion that they are engaged in interstate trade of any kind, or how the alleged restraint had any effect on commerce.[200] Plaintiffs make only the bare assertion that the Sheriff Defendants "restrain[ed] [their] interstate trade." Plaintiffs have provided no factual support for their allegation that the alleged conspiracy had the effect of restraining Plaintiffs' interstate trade or that the Sheriff Defendants' actions operated to restrain commercial competition in some substantial way.

Finally, a viable Sherman Act claim requires a plaintiff to sufficiently allege trade was restrained in the "relevant market."[201] In defining the relevant market, district courts look to "the area of effective competition."[202] This is the area "in which the seller operates and to which buyers can practicably turn for supplies."[203] In addition, the proposed market must "correspond to the commercial realities of the industry and be economically

---

[199] *See Marucci Sports, LLC*, 751 F.3d at 375 (finding that, although the plaintiff alleged the defendants' independent actions were evidence of a conspiracy, the plaintiff's allegations "[did] not set forth facts that demonstrate a "meeting of the minds" between the NCAA, NFHS, and other alleged conspirators"); *compare Broyles v. Wilson*, No. 93-3132, 1993 WL 347222, at *4 (5th Cir. Aug. 19, 1993) (affirming dismissal where complaint contained no specific facts showing that the defendant and his alleged co-conspirators intended to join a conspiracy), *with Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992) (holding that plaintiffs pleadings were sufficient because, in addition to alleging that a conspiracy existed, the complaint indicated that the defendants met and collectively agreed on a method of manipulating the relevant market).
[200] *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 484 (1940).
[201] *Apani*, 300 F.3d at 627.
[202] *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961).
[203] *Apani*, 300 F.3d at 626 (citing *Tampa Elec. Co.*, 365 U.S at 327).

significant."[204] These "commercial realities" include "size, cumbersomeness, and other characteristics of the relevant product" along with "regulatory constraints impeding the free flow of competing goods into an area, [such as] perishability of products, and transportation barriers."[205] In this case, Plaintiffs have made no allegations identifying a relevant market. Accordingly, Plaintiffs have failed to sufficiently allege any of the three elements necessary to an actionable Sherman Act claim under § 1, and Plaintiffs' Sherman Act claims against the Sheriff Defendants must be dismissed.[206]

### E. Plaintiffs' General Maritime Tort/Negligence Claims Against the Sheriff Defendants

Before a plaintiff may bring a maritime negligence or intentional tort claim, he must first establish that admiralty jurisdiction exists.[207] Federal courts have subject matter jurisdiction over admiralty cases pursuant to Article III, Section 2, and 28 U.S.C. § 1333(1).[208] To establish admiralty jurisdiction, "this Circuit applies a two-part inquiry."[209] "The first question is geographic" and requires the court to determine whether "the tort occur[ed] on navigable waters."[210] Second, courts must consider

---

[204] *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962) (internal quotes omitted).

[205] *Apani*, 300 F.3d at 626 (citations omitted).

[206] Additionally, as the U.S. Supreme Court has "repeatedly recognized, the Sherman Act was intended to prohibit only *unreasonable* restraints of trade." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Ok.*, 468 U.S. 85, 98 (1984) (emphasis added) (citing *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 342–343); *Nat'l Soc'y of Prof. Engineers v. United States*, 435 U.S. 679, 687–688 (1978); *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)). As the Court discusses below, Golden Pond is private property. Because it is reasonable for "owners of private property [to] forbid entry to anyone for purposes of hunting or fishing and the like," *Parm v. Shumate*, 513 F.3d 135, 140 (5th Cir. 2007) (quoting *Walker Lands, Inc. v. East Carroll Parish Police Jury*, 871 So. 2d 1258, 1265–66 (La. App. 2 Cir. 2004)), and "[p]olice officers have an affirmative duty to enforce the law," *Lewis v. Goodie*, 798 F. Supp. 382, 390 (W.D. La. 1992), including the duty to exclude unwanted persons from private property following a "reasonably contemporaneous request to leave," *State v. Ceaser*, 859 So. 2d 639, 644 (La. 2003), this alleged "restraint of trade"—specifically, a private person requesting that Plaintiffs leave his property and a police officer enforcing that request—is not unreasonable.

[207] *Richendollar v. Diamond M. Drilling Co.*, 819 F.2d 124, 127 (5th Cir. 1987) (en banc).

[208] Under 28 U.S.C. 1333(1), courts have "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction."

[209] *Molett v. Penrod Drilling Co.*, 872 F.2d 1221, 1224 (5th Cir. 1989).

[210] *Richendollar*, 819 F.2d at 127.

whether the wrong "bear[s] a significant relationship to traditional maritime activity."[211] Under this test, "waters are navigable 'when they form . . . a continued highway over which commerce is or may be carried on with other States or foreign countries.'"[212] Stated differently, navigable waters in the context of establishing admiralty jurisdiction are "interstate waters that are navigable in fact."[213]

Plaintiffs frame their maritime tort claims against the Sheriff Defendants as based on the fact that "To date, Plaintiffs have received no response from . . . SHERIFF WEBRE" regarding the correspondence Carpenter directed to Sheriff Webre "in an effort to ascertain the parameters of SGT. PREVOST's admonition and threats of arrest."[214] Plaintiffs do not allege *any* of their interactions with the Sheriff Defendants took place on navigable waters. Because the jurisdictional prerequisite of these claims is absent, namely that the alleged intentional or negligent tort occurred on navigable waters, the Court has no jurisdiction over the maritime tort or negligence claim against the Sheriff Defendants, and these claims must be dismissed.

## VI.    THE CASTEX DEFENDANTS' 12(B)(6) MOTION TO DISMISS

### A. Plaintiffs' General Maritime Tort/Negligence Claims Against the Castex Defendants

As the Court previously noted,[215] before a plaintiff may bring a maritime negligence or intentional tort claim, he must first establish that admiralty jurisdiction exists. To establish admiralty jurisdiction, a plaintiff must sufficiently allege the tort occurred on

---

[211] *Id.* (quoting *Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268 (1972)); *see also Sanders v. Placid Oil Co.*, 861 F.2d 1374, 1376–77 (5th Cir. 1988) (citation omitted).

[212] *The Daniel Ball*, 77 U.S. 557, 563 (1870); *see also The Montello*, 87 U.S. 430, 442 (1874) (recognizing that if a waterway is capable of being used for commerce, it is navigable).

[213] *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (noting the traditional definition of navigable waters, rejecting the argument that only actually-navigable waters can be regulated by the Clean Water Act, and holding the word "navigable" in the Act cannot be divested of all meaning).

[214] R. Doc. 25 at ¶44; R. Doc. 65 at 7, 11.

[215] *See* the Court's discussion *supra* notes 207–14.

navigable waters and that the wrong "bear[s] a significant relationship to traditional maritime activity."[216] Under this test, "waters are navigable 'when they form . . . a continued highway over which commerce is or may be carried on with other States or foreign countries.'"[217] Stated differently, navigable waters in the context of establishing admiralty jurisdiction are "interstate waters that are navigable in fact."[218]

Plaintiffs contend the maritime tort—which they describe as being impermissibly excluded from fishing on public land—occurred on Golden Pond. In their complaint, Plaintiffs allege they accessed Golden Pond on a "vessel [that] is 24 [feet] in length and powered by a 225 [horsepower] outboard motor"[219] through a series of "interconnected natural navigable waterways,"[220] which connect Golden Pond to the Gulf Mexico.[221] Thus, Plaintiffs have sufficiently alleged Golden Pond is an "interstate water[body] that [is] navigable in fact."[222] Accordingly, Golden Pond meets the definition of "navigable waters" for the purposes of maritime jurisdiction.[223] Further, chartered fishing tours, which by nature take place on water, bear a significant relationship to traditional maritime activity.[224] Accordingly, with respect to

---

[216] *Richendollar*, 819 F.2d at 127 (quoting *Aviation, Inc.*, 409 U.S. at 268); *see also Sanders*, 861 F.2d at 1376–77 (citation omitted).

[217] *The Daniel Ball*, 77 U.S. at 563; *see also The Montello*, 87 U.S. at 442 (recognizing that if a waterway is capable of being used for commerce, it is navigable).

[218] *Rapanos*, 547 U.S. at 723 (noting the traditional definition of navigable waters, rejecting the argument that only actually-navigable waters can be regulated by the Clean Water Act, and holding the word "navigable" in the Act cannot be divested of all meaning).

[219] R. Doc. 25 at ¶ 14.

[220] *Id.* at ¶¶ 15, 16.

[221] *See id.* at ¶ 8 (alleging that Golden Pond is "a tidal influenced lake situated south and west of Bay Rambo which is north of Grand Isle, Louisiana, within the territorial bounds of Lafourche Parish, Louisiana. Over 80 acres in area, the Golden Pond is presently susceptible of commercial navigation, is subject to tidal influence, and is connected to numerous navigable tidal rivers, lakes, and bays, to Caminada Bay which flows into the Gulf of Mexico. These bodies of water form a continuous, navigable highway on which commercial activity takes place").

[222] *Rapanos*, 547 U.S. at 723 (noting the traditional definition of navigable waters, rejecting the argument that only actually-navigable waters can be regulated by the Clean Water Act, and holding the word "navigable" in the Act cannot be divested of all meaning).

[223] *See PPL Montana, LLC v. Montana*, 565 U.S. 576, 591–92 (2012) (noting *The Daniel Ball* formulation of navigability, "concerning federal power to regulate navigation," "is not applied in the same way" in different types of cases).

[224] *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675–76 (1982) (holding "pleasure boats" bear "a significant relationship with maritime commerce").

Plaintiffs' maritime tort claims against the Castex Defendants, the Court finds Plaintiffs have sufficiently pleaded facts to establish this Court's admiralty jurisdiction.

Having established the Court's maritime jurisdiction, to survive the motion to dismiss, Plaintiffs' amended complaint must state a claim that is plausible on its face, supported by factual allegations that would entitle them to relief. In this case, Plaintiffs allege the Castex Defendants tortiously interfered with Plaintiffs' right to fish on waters open to the public.[225] Plaintiffs assert their right to fish on public waters exists in the Louisiana Constitution, which provides that the freedom to hunt, fish, and trap wildlife is a valued natural heritage that will be forever preserved.[226] They also find support in the Louisiana Civil Code, which provides that everyone has the right to fish in the State's waters.[227] Plaintiffs' cause of action in tort rests on two alternative theories: (1) that the bed of Golden Pond is owned by the State of Louisiana and held in public trust and (2) that Golden Pond is encumbered by a federal navigational servitude.

In support of their contention that the bed of Golden Pond is owned by the State and "insusceptible of private ownership" Plaintiffs argue that, because Golden Pond is navigable in fact, it "is navigable in law,"[228] and therefore, "subject to the Public Trust Doctrine."[229] Because the water bottom of Golden Pond is held by the State in public trust, Plaintiffs submit, the State could not have validly conveyed the bed of Golden Pond to the Castex Defendants or their predecessors in title.[230] Alternatively, Plaintiffs claim the

---

[225] Plaintiffs allege Golden Pond is "insusceptible of private ownership." R. Doc. 25 at ¶ 8(N).
[226] *See* LA. CONST. art. I, § 27.
[227] *See* La. Civ. Code art. 452.
[228] R. Doc. 41 at 9.
[229] *Id.* at 12.
[230] *Id.*

waters of Golden Pond are subject to a federal navigational servitude, which they aver "includes the right to commercially fish."[231]

In response, the Castex Defendants argue the Fifth Circuit's 1993 and 1995 rulings in *Dardar v. Lafourche Realty Co., Inc.* preclude Plaintiffs' claims.[232] In *Dardar*, commercial fishermen sued the Lafourche Realty Company, which at the time owned Golden Pond, seeking the right to use the system of navigable waters on the Lafourche Realty property.[233] "The State of Louisiana intervened, asserting a right of public use of the waters and claiming title to the water bodies and over twelve thousand acres of land under the waters."[234] Ultimately, in two separate opinions, the Fifth Circuit determined the property at issue in *Dardar* is not owned by the State, is not subject to the public trust, and is not encumbered by a navigational servitude.[235] It is undisputed that Golden Pond is situated within the boundaries of the property at issue in *Dardar*.[236]

The preclusive effect of a prior judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata."[237] Issue preclusion, or "collateral estoppel," bars "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the

---

[231] *Id.* at 17.

[232] 985 F.2d 824 (5th Cir. 1993); 55 F.3d 1082 (5th Cir. 1995).

[233] *Dardar I*, 985 F.2d at 826.

[234] *Id.*

[235] *Id.* ("Upon finding that none of the Lafourche Realty property constituted the 'bottoms of natural navigable water bodies . . . [or] the seashore,' the district court concluded that the State did not run afoul of any restriction on alienation of public things. This conclusion was correct. At the time of the issuance of patents, the property consisted of only inland non-navigable water bodies and swamp land subject to overflow—neither of which is inalienable public property under the Code."); *Dardar II*, 55 F.3d at 1083, 1086 (stating that the "application of the *Kaiser Aetna* test inexorably leads to the conclusion that the federal navigational servitude should not be imposed").

[236] According to Plaintiffs, "Golden Pond is a naturally existing lake, . . . [t]he majority of [which] falls within Section 19 of T[ownship] 20 S[outh], R[ange] 23 E[ast], in Lafourche Parish." R. Doc. 25 at ¶ 8(A). The *Dardar* decisions expressly addressed the entirety of this same Section 19. *See* Rec. Doc. 15-4 at 3 (listing the exact areas at issue in *Dardar*, including "Township 20 South, Range 23 East[:] All of section[] . . . 19"); *see also* R. Doc. 49-4 (displaying an aerial map of the Golden Pond showing it falls within the *Dardar* judgment's boundaries).

[237] *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

issue recurs in the context of a different claim."[238] Issue preclusion is intended to protect parties from multiple lawsuits, to avoid the possibility of inconsistent decisions, and to conserve judicial resources.[239]

Although the Federal Rules of Civil Procedure generally require an affirmative defense, including one based in res judicata, be pleaded in the defendant's answer, a claim may also be dismissed on a Rule 12(b)(6) motion if a successful affirmative defense appears clearly on the face of the pleadings.[240] Thus, the court may dismiss a claim under Rule 12(b)(6) if it appears from the face of the complaint that the claim is barred by res judicata.[241] A litigant who was not a party to the prior suit cannot be said to have "had a 'full and fair opportunity to litigate' the claims and issues settled" in the prior lawsuit,[242] and therefore, issue preclusion generally cannot be applied against him. There are, however, six exceptions to the rule against nonparty preclusion, as articulated by the U.S. Supreme Court in *Taylor v. Sturgell*.[243]

Relevant to the case at bar is *Taylor*'s third exception, the "adequate representation" exception.[244] Pursuant to this exception, "a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit."[245] For the adequate representation exception to apply in this case, the Court must find (1) Plaintiffs' interest and the interest of the State of

---

[238] *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748, (2001)).

[239] *Lytle v. Household Mfg., Inc.*, 494 U.S. 545 (1990) (citing *Montana v. United States*, 440 U.S. 147 (1979)).

[240] *Kan. Reinsurance Co. v. Cong. Mktg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994); *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *Larter & Sons, Inc. v. Dinkler Hotels Co.*, 199 F.2d 854, 855 (5th Cir. 1952); *see also Clifton v. Warnaco, Inc.*, Nos. 94-10226 & 94-10657, 1995 WL 295863, at *6 n.13 (5th Cir. April 18, 1995); *Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) (permitting *sua sponte* dismissal on res judicata grounds when, in the interest of judicial economy, both actions were brought before the same court, even though the record contained neither the complaint nor the order of dismissal in the earlier action).

[241] *See, e.g.*, *Cade v. U.S. Postal Serv.*, 45 F. App'x 323 (5th Cir. 2002).

[242] *Id.*

[243] 553 U.S. 880 (2008).

[244] *Id.* (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 789 (1996) (internal quotation marks omitted)).

[245] *Id.*

Louisiana in *Dardar* are aligned, and (2) the State of Louisiana was acting in a representative capacity in the *Dardar* litigation.[246]

In *Dardar*, the State of Louisiana made the argument Plaintiffs now assert; namely, that the bed of Golden Pond is property of the State of Louisiana held in public trust and, therefore, the public has a right to use its waters, and/or the waters of Golden Pond are encumbered by a federal navigational servitude and, therefore, Golden Pond is accessible to the public. "[T]he proposition that governments may represent private interests in litigation, precluding relitigation, is clear,"[247] so long as the representation was adequate. Plaintiffs make no allegations that the State of Louisiana did not adequately represent the interests of the public in the *Dardar* litigation. It is clear that the relationship between the State of Louisiana, acting on behalf of the public, and Carpenter, a member of the public, is "close enough to preclude relitigation."[248]

Having determined the "adequate representation" exception to the bar on nonparty issue preclusion applies in this case, the Court next determines whether each of

---

[246] *See id.* at 900.

[247] *Southwest Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 98 (5th Cir. 1977). The Court notes that in *Southwest Airlines*, the Fifth Circuit referred to this exception to nonparty preclusion as "virtual representation," an exception explicitly rejected by the U.S. Supreme Court in *Sturgell*. Closer examination of the Fifth Circuit's opinion in *Southwest Airlines*, however, reveals the concept analyzed in that case is more properly referred to as the "adequate representation" exception. For example, in determining whether an exception to the bar on nonparty preclusion applied in *Southwest Airlines*, the Fifth Circuit looked to the Restatement (Second) of Judgments section 41, the same section of the Restatement to which the U.S. Supreme Court cited in concluding the adequate representation exception remained viable in *Sturgell*. *Compare Southwest Airlines*, 546 F.2d at 98, *with Taylor*, 553 U.S. at 894. Additionally, in *Nevada v. United States*, the U.S. Supreme Court explained, citing Restatement (Second) of Judgments § 41(d), that it cannot "consistently with any principle, be tolerated that, after the United States in acting on behalf of its wards had invoked the jurisdiction of it courts . . . these wards should themselves be permitted to relitigate question." 463 U.S. 110 (1983) (quoting *Heckman v. United States*, 224 U.S. 413, 446 (1912)) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 41(d) (1982)).

[248] *Southwest Airlines*, 546 F.2d at 98; *see also Nevada*, 463 U.S. at 142 ("There can be no more complete representation than that on the part of the United States in acting on behalf of [its] dependents . . . ." (quoting *Heckman*, 224 U.S. at 444)); RESTATEMENT (SECOND) OF JUDGMENTS § 41(d) (explaining that where a public official or agency exercises his "authority to maintain or defend litigation on behalf of individuals or of a collective public interest," he "represents such other persons for the purposes of litigation concerning the interests in question and the judgment is binding on them"). The Court notes that access to a public waterbody is not "personal in nature," as it does not concern a person's individually held right, such as the right to vote or the deprivation of personal property. *See Richards*, 517 U.S. at 801–02 & n.6.

the elements of collateral estoppel are met. To establish collateral estoppel, a party must show "(1) that the issue at stake [is] identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action."[249]

The issues at stake in this case and the issues at stake in the *Dardar* litigation are identical. In this case, as in *Dardar*, the underlying issue is whether the waters of Golden Pond are accessible to the public. As in *Dardar,* answering this question depends on whether (1) the bed of Golden Pond is owned by the State of Louisiana and held in public trust for the use of the people of Louisiana;[250] or (2) Golden Pond is encumbered by a federal navigational servitude.[251]

### 1. Public Trust Doctrine

Plaintiffs first argue Golden Pond is accessible to the public, as it is subject to the public trust doctrine. In support of this claim, Plaintiffs, like the State of Louisiana in *Dardar*, argue "Whether the area in question was navigable in 1812 is of no moment to the issues before this Court in 201[8]."[252] Plaintiffs are mistaken.

As the Fifth Circuit in *Dardar I* explained, "Louisiana, upon attaining statehood [in 1812], received ownership of all navigable waters within its borders and all tide waters and the lands under them from the United States in public trust."[253] The Fifth Circuit

---

[249] *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009) (citing *Wehling v. CBS*, 721 F.2d 506, 508 (5th Cir. 1983)).
[250] *Dardar I*, 985 F.2d at 826.
[251] *Dardar II*, 55 F.3d 3d at 1083, 1086.
[252] *See id.* at 831 (noting that the State of Louisiana argued "waters which are today saline, subject to ebb and flow of the tide, and de facto used in commercial navigation" are State owned).
[253] *Dardar I*, 985 F.2d at 827 (citing *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 479–81 (1988)); *see also State v. Jefferson Island Salt Mining Co.*, 163 So. 145, 152 (La. 1935) ("The title of the state is dependent upon the navigability of [the waterbody] in 1812, the date of the admission of Louisiana into the Union. *If at that time* the [waterbody] was a navigable body of water[,] all of its bed below high water mark became the property of the state in virtue of her inherent sovereignty." (emphasis added))).

noted, however, that non-navigable waters such as "swamplands subject to overflow" could be conveyed from the State to private owners.[254] Ultimately, the Fifth Circuit held that, "[p]ursuant to the Swamp Land Grant Acts of 1849 and 1850," "[t]he State conveyed the water bottoms [at issue in this case] by various transfers to [Castex's] ancestors-in-title between 1861 and 1901."[255] The Fifth Circuit affirmed the district court's "finding that no natural navigable water bodies existed on the property in 1812" and therefore rejected the State's contention that the water bottoms at issue in *Dardar* were owned by the State and, therefore, subject to the public trust.[256]

### 2. Federal Navigational Servitude

In support of their maritime tort/negligence claim, Plaintiffs next argue Golden Pond is subject to a federal navigational servitude. "The navigational servitude arises by virtue of the Commerce Clause in some navigable waters."[257] When a water body is subject to a navigational servitude, it gives rise to the right of the public to use those waterways as "continuous highways for the purpose of navigation in interstate commerce."[258] This servitude does not, however, extend to all navigable waters generally; rather, "unless a navigational servitude is imposed on a waterway, the public has no right to use it."[259] "A landowner whose properties contain navigable waterways may escape this servitude by showing either that the waterways were not navigable in their natural state or, if naturally navigable, by demonstrating that his interests outweigh those of the public."[260]

---

[254] *Id.* at 826.
[255] *Id.* The original quote states "The State conveyed the water bottoms by various transfers to *Lafourche Realty's* ancestors-in-title between 1861 and 1901"; however, Lafourche Realty conveyed the land to Castex in 2008. R. Doc. 15-3.
[256] *Id.* at 826–32.
[257] *Dardar I*, 985 F.2d at 832.
[258] *Id.*
[259] *Id.* (citing *United States v. Kaiser Aetna*, 444 U.S. 164, 175 (1979)).
[260] *Dardar II*, 55 F.3d at 1084.

In *Kaiser Aetna v. United States*, the U.S. Supreme Court noted several factors indicating no navigational servitude was imposed on Kuapa Pond, the water body at issue in that case, despite its being navigable in fact:

> 1) Kuapa Pond in its natural state could not have been navigated and was not comparable to the major natural bodies of water to which the servitude had earlier been applied; 2) the pond was private property under Hawaiian law; 3) the pond had been converted to a navigable body of water by the petitioners through the investment of private funds; and 4) the Corps had earlier consented to the conversion.[261]

In *Dardar II*, the Fifth Circuit evaluated whether the waterbodies at issue in that case, including Golden Pond, were subject to a navigational servitude. In its evaluation under the *Kaiser Aetna* framework, the court considered whether: (1) "the waterway was navigable in its natural state and is comparable to other waterbodies upon which the servitude has been imposed"; (2) "is on private property and made navigable with private funds"; and (3) "was made navigable by actions approved by the Corps of Engineers."[262] The Fifth Circuit held Bayou Ferblanc and Bayou Rambo "were not naturally navigable," and thus, "the public had no right to their free use." Addressing "the remaining waterbodies within the subject area," which included Golden Pond, the Fifth Circuit held that, even though Golden Pond is navigable in fact, "the remaining *Kaiser Aetna* factors would militate against imposition of the servitude":

> The record clearly reflects that *all* of the remaining waterways at issue are privately owned and that their owners exclude others from entry. The record also reflects that the waterbodies presently navigable were not navigable in their natural state. Finally, the improvements making these bodies navigable were accomplished with private funds after receipt of approval from the Army Corps of Engineers.[263]

---

[261] *Dardar I*, 985 F.2d at 832 (citing *Kaiser Aetna*, 444 U.S. at 178–79).
[262] *Dardar II*, 55 F.3d at 1085.
[263] *Id.* at 1086.

Based on these facts, the Fifth Circuit concluded that the "application of the *Kaiser Aetna* test inexorably leads to the conclusion that the federal navigational servitude should not be imposed on Golden Pond."[264]

It appears from the face of the complaint that Plaintiffs' maritime tort/negligence claims are barred by collateral estoppel.[265] The Court finds the issues of whether Golden Pond is accessible to the public because its bed is subject to the public trust doctrine and whether its waters are encumbered by a federal navigational servitude are identical to the issues before the Fifth Circuit in the *Dardar* litigation. Moreover, these issues were actually litigated in *Dardar*, and the Fifth Circuit's determination of those issues was a critical and necessary part of its judgment.[266] As a result, Plaintiffs are precluded from bringing their maritime tort claims based on the theory that they were wrongfully excluded from a waterbody situated on a waterbed owned by the State and held in public trust or that the waters of Golden Pond are accessible to the public by virtue of being encumbered by a navigational servitude.[267] Bound by the Fifth Circuit's factual findings in *Dardar*, dismissal of Plaintiffs' claims against the Castex Defendants is warranted by reason of res judicata.[268] Accordingly, Plaintiffs' maritime tort and negligence claims against the Castex Defendants must be dismissed.

---

[264] *Id.*

[265] *See Cade*, 45 F. App'x at 323.

[266] *See Rabo Agrifinance*, 583 F.3d at 353.

[267] Plaintiffs also allege that private persons have a right to fish on any waters that are encumbered by a Federal Navigational Servitude. This argument is expressly foreclosed by *Parm*, 513 F.3d at 142–45 ("[T]he [federal] navigational servitude does not create a right to fish on private riparian land.").

[268] *See Cade*, 45 F. App'x at 323. Further, the doctrine of *stare decisis* applies with "special force" to decisions affecting title to land. *Confederated Salish and Kootenai Tribes v. Namen*, 665 F.2d 951, 960 (9th Cir. 1982). "Where questions arise which affect titles to land, it is of great importance to the public that, when they are once decided, they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change . . . . Doubtful questions on subjects of this nature when once decided, should be considered no longer doubtful or subject to change." *United States v. Title Ins. Co.*, 265 U.S. 472, 486 (1924).

### B. Plaintiffs' § 1983 Conspiracy Claim Against Plaisance

Plaintiffs allege Plaisance violated their constitutional rights by telling Plaintiffs to leave the Castex property and subsequently "pursuing a complaint."[269] According to Plaintiffs' amended complaint and supplemental memorandum, Plaisance "conspired [with the Sheriff Defendants] under color of state law to deprive Plaintiffs of their rights, privileges and immunities."[270]

For Plaintiffs to state a cause of action against Plaisance, a private actor, under § 1983, they must allege that he, as a person who deprived them of a federal right, was acting under color of state law.[271] If Plaisance was a private citizen not acting under the color of state law at the time he allegedly violated the Plaintiff's constitutional rights, he still may have liability under § 1983 if he conspired with or acted in concert with state actors.[272] A non-state actor may be liable under § 1983 if the private citizen was a "willful participant in joint activity with the State or its agents."[273] Thus, Plaisance may be individually liable under § 1983 if he conspired with the Sheriff Defendants to deprive Plaintiffs of their constitutional rights. To state a claim for conspiracy under § 1983, Plaintiffs must allege: (1) an agreement between the private and public defendants to commit an illegal act and (2) a deprivation of a constitutional right.[274] To establish the existence of a conspiracy, a plaintiff "must show that the defendants agreed to commit an illegal act"[275] and "allege specific facts to show [their] agreement."[276]

---

[269] R. Doc. 25 at ¶ 34.
[270] *Id.* at ¶¶ 55, 56; *see* R. Doc. 65 at 9.
[271] *Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004).
[272] *Id.* (citing *Cinel v. Connick*, 15 F.3d 1338, 1342 (5th Cir. 1994)).
[273] *Cinel*, 15 F.3d at 1343.
[274] *Priester*, 354 F.3d at 420.
[275] *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982); *see also Hale v. Townley*, 45 F.3d 914, 920–21 (5th Cir. 1995); *Manton v. Strain*, No. 09-0339, 2010 WL 4364552, at *6 (E.D. La. Oct. 21, 2010).
[276] *Priester*, 354 F.3d at 412.

Plaintiffs argue that Plaisance acted under color of state law when he told Plaintiffs to leave Golden Pond and subsequently notified the police of Plaintiffs' alleged trespass. This argument implies that the Sheriff's Department's role in issuing trespass warnings and threatening arrest subjects a private citizen who reports a trespass to § 1983 liability. "This bootstrap argument goes beyond that envisioned by the 'joint activity' test . . . . Neither 'private defendants' misuse of a valid state statute' nor '[p]olice reliance in making an arrest on information given by a private party' renders a private party a state actor."[277] Thus, the Court finds Plaisance was not acting the under color of state law when he told Plaintiffs to leave what Plaisance believed to be private property, nor was he acting as a state actor when he informed the Sheriff's Department of Plaintiffs' alleged trespass.

Plaintiffs' amended complaint is devoid of any allegations suggesting Plaisance agreed to conspire with the Sheriff Defendants. Plaintiffs describe no communications that would provide circumstantial evidence of an agreement.[278] Construing the facts in the light most favorable to Plaintiffs, the only contact the Court could presumably infer Plaisance had with the Sheriff's Department—and not even necessarily with the Sheriff Defendants themselves— is that Plaisance contacted the Sheriff's Department to "pursu[e] a complaint against Plaintiff for trespassing."[279] Even if Plaisance contacted the Sheriff's Department, this conduct is not sufficient evidence of "an agree[ment] to commit an illegal act,"[280] and without more, does not make out an actionable § 1983 conspiracy claim. Accordingly, this claim is dismissed.

---

[277] *Blankenship*, 653 F. App'x at 340 (quoting *Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988)).
[278] *See generally* R. Doc. 25.
[279] *Id.* at ¶ 34.
[280] *Priester*, 354 F.3d at 420.

### C. Plaintiffs' Sherman Act Claims Against the Castex Defendants

The Court dismisses Plaintiffs' Sherman Act Claims against the Castex Defendants for the same reasons the Court dismissed Plaintiffs' Sherman Act claims against the Sheriff Defendants.[281]

## CONCLUSION

**IT IS ORDERED** that Defendants Sergeant Jeffery Prevost and Lafourche Parish Sheriff Craig Webre's motion for partial dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED.**[282] Plaintiffs' federal law claims arising under 42 U.S.C. § 1983, maritime tort, and 15 U.S.C. §§ 1, 13, 15 against Defendants Sergeant Jeffery Prevost and Lafourche Parish Sheriff Craig Webre are hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Defendants Castex Lafourche, LP and Glenn M. Plaisance's motion for partial dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED.**[283]  Plaintiffs' federal law claims for maritime tort and those arising under 15 U.S.C. §§ 1, 13, 15 against Defendants Castex Lafourche, LP and Glenn M. Plaisance are hereby **DISMISSED WITH PREJUDICE.** Plaintiffs' 42 U.S.C. § 1983 conspiracy claim against Defendant Glenn M. Plaisance is hereby **DISMISSED WITH PREJUDICE.**[284]

**New Orleans, Louisiana, this 23rd day of March, 2018.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[281] *See* the Court's discussion *supra* notes 182–206.
[282] R. Doc. 34.
[283] R. Doc. 31.
[284] The Court defers ruling on Plaintiffs' state law claims.

45